[Cite as *State v. Wood*, 2016-Ohio-143.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26134 |
| | : | |
| v. | : | T.C. NO. 13CR178 |
| | : | |
| SHAWN D. WOOD | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the ___15th___ day of ____January____, 2016.

. . . . . . . . . . .

ANDREW T. FRENCH, Atty, Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

CHRISTOPHER A. DEAL, Atty. Reg. No. 0078510, 131 N. Ludlow Street, Suite 630, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Shawn D. Wood appeals his conviction and sentence for aggravated murder, aggravated robbery, grand theft of a motor vehicle, and having a weapon while under disability. Wood filed a timely notice of appeal with this Court on March 17, 2014.

{¶ 2} The incident which forms the basis for the instant appeal occurred in mid-

December of 2011, when the victim, Corey Turner, was robbed and shot to death in his residence located at Barrington Apartments, 381 Forest Park Drive in Harrison Township, Ohio. At the time Turner was killed, he was employed as an organist and choir director at the Greater Allen African Methodist Episcopal (AME) Church located in Dayton, Ohio.

### Procedural History

{¶ 3} On March 5, 2013, Wood was indicted for one count of aggravated murder (while committing or attempting to commit aggravated robbery), in violation of R.C. 2903.01(B), an unclassified offense; one count of aggravated murder (while committing or attempting to commit aggravated burglary), in violation of R.C. 2903.01(B), an unclassified offense; one count of aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), a felony of the first degree; one count of aggravated robbery (serious physical harm), in violation of R.C. 2911.01(A)(3), a felony of the first degree; one count of aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), a felony of the first degree; one count of aggravated burglary (serious physical harm), in violation of R.C. 2911.11(A)(1), a felony of the first degree; one count of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree; one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree; and one count of grand theft of a motor vehicle, in violation of R.C. 2913.02(A)(1), a felony of the fourth degree. All of the preceding counts were accompanied by a three-year firearm specification. Finally, Wood was indicted for two counts of having a weapon while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), both felonies of the third degree; and one count of having a weapon while under disability (prior offense of violence conviction), in violation of R.C.

2923.13(A)(2), a felony of the third degree.   The indictment alleged that all of the charged offenses were committed by Wood against Turner between the dates of December 13, 2011, and December 16, 2011.

{¶ 4} At his arraignment on March 7, 2013, Wood stood mute, and the trial court entered a plea of not guilty on his behalf.   On March 20, 2013, a trial date was set of July 29, 2013.   Wood subsequently filed a motion to suppress on May 21, 2013, in which he sought the suppression of his phone records, DNA swabs taken from him by police, any statements he made to law enforcement officials after being taken into custody, and any pretrial identifications.   A hearing was held on Wood's suppression motion over the following dates: June 2, 2013, July 3, 2013, and July 11, 2013.   On July 16, 2013, the trial court issued a decision overruling the majority of Wood's motion to suppress.   The sole portion of the suppression motion sustained by the trial court was the section pertaining to statements Wood made to police after he requested counsel.

{¶ 5} On July 26, 2013, defense counsel filed a motion requesting a continuance of the trial date in order to obtain an expert to refute the State's cellphone evidence.   A time waiver was filed on July 29, 2013.   Defense counsel signed the time waiver, but Wood refused to sign the document.   Wood's motion for a trial continuance was nevertheless granted by the trial court in an entry issued on August 1, 2013.   A new trial date was scheduled for January 27, 2014.

{¶ 6} Immediately prior to trial on January 27, 2014, Wood waived his right to a jury trial regarding the three counts of having weapons while under disability with which he was charged.[1]   Wood's jury trial began on the same day with respect to the remaining

---

[1]Upon consideration, the trial court ultimately found Wood guilty on February 7, 2014, of

counts in the indictment. After several days of testimony, the State rested its case on February 3, 2014. Defense counsel made a Crim.R. 29 motion for acquittal, which was denied by the trial court. The defense rested on February 6, 2014, without presenting any additional evidence. The jury found Wood guilty on all counts. After merging several counts in the indictment, the trial court sentenced Wood to life in prison, without the possibility of parole, plus an additional twenty-three years.

**Factual Background**

{¶ 7} During the week of December 12, 2011, Turner and the AME choir were preparing for their annual Christmas performance and were scheduled to practice every day that week. The last time Turner attended choir practice, however, was on the evening of Tuesday, December 13, 2011. When he failed to attend choir practice on the evening of Wednesday, December 14, 2011, Shirley Thomaston, a close friend of Turner and a member of the choir, called him. Unable to reach Turner by telephone, Thomaston testified that she drove by his apartment in order to check on him. Although Thomaston could see that the lights were on in Turner's apartment, nobody came to the door when she honked her car horn. Thomaston also observed that Turner's vehicle, a gray Honda Accord sedan, was not in the parking lot. Thomaston testified that she found it very unusual that Turner would leave his apartment without turning off the lights because he was very determined about saving money on his electric bill. Thomaston testified that she left Turner's apartment complex and went home.

{¶ 8} After Turner failed to attend choir practice on the night of Thursday, December 15, 2011, several concerned individuals went to his apartment in an effort to

all three counts of having a weapon while under disability.

locate him. The lights were still on in the apartment, the front door was locked, and no one answered the door. Turner's gray Honda Accord was not in the parking lot. One of Turner's friends called 911 and explained the unusual situation to police, while another individual contacted a security guard at the apartment complex. Eventually, the apartment manager and the security guard gained entry into Turner's apartment in the early morning hours of Friday, December 16, 2011. Initially, they observed that the apartment had been ransacked. Upon further investigation, they discovered Turner's dead body in his bedroom laying on his side on the bed.

{¶ 9} Shortly thereafter, the police arrived and began their investigation. Turner had been shot once in the back of the head. When the police rolled Turner over, they found a spent bullet laying under his body and a second spent bullet near the end of the bed. No shell casings were found, nor was a weapon discovered in Turner's apartment. Two televisions were found to be missing from Turner's apartment, as well as various other electronic equipment. There were no signs of forced entry, and based on the manner in which the front door locked, the police concluded that whoever killed Turner had taken his keys and locked the door from the outside. The coroner who performed the autopsy testified that based on the condition of the body when found, Turner had been shot sometime between the night of December 13, 2011, and early on December 15, 2011.

{¶ 10} Utilizing Turner's phone records, the police were able to identify the appellant, Shawn Wood, as the primary suspect in the shooting. Specifically, the records established that Turner and Wood had been in frequent contact with one another in the hours leading up to the time when Turner was last seen alive on the night of December

13, 2011, after he left choir practice. At 8:57 p.m., Turner called Wood from a phone inside a Marathon gas station near the AME church. The attendant at the gas station testified that Turner seemed agitated during the phone conversation. The attendant also testified that he overheard Turner tell the person to whom he was speaking, "I said I'll be there." The phone records further established that Wood called Turner approximately one hour later at his home. Turner then called Wood approximately twenty minutes later at 10:21 p.m. Thereafter, no outgoing calls were made from Turner's cellphone, and although there were several incoming calls, they all remained unanswered.

{¶ 11} Wood's cellphone records were also introduced at trial and established that his phone was in the area of Turner's apartment when the shooting was alleged to have occurred. Specifically, FBI Agent Kevin Horan testified that based on data provided by Wood's cellular service provider, his cellphone was in the vicinity of the AME church when the last three calls between Wood and Turner were exchanged on the night of December 13, 2011. The evidence also established that beginning at 10:26 p.m., when the last call that Turner made to Wood was ended, Wood's cellphone was either powered off or had its battery removed. However, at 6:31 a.m. on December 14, 2011, Wood's cellphone records establish that his phone had been turned back on because an incoming call came from his mother. Agent Horan testified that when this call was received, Wood's cellphone was in close proximity to Turner's apartment. Moreover, during the time that Wood's cellphone was being used in the vicinity of the apartment, Turner's neighbor, Betty Harrison, testified that she observed Turner's gray Honda Accord being driven away from his apartment building. However, because it was still dark outside, Harrison testified that she was unable to see who was driving the vehicle.

{¶ 12} The State also presented the testimony of Ronald Kurrek, an acquaintance of Wood. Kurrek testified that in the days preceding Turner's death, he was contacted by Wood. Wood picked up Kurrek and asked him to perform some work on his car. Kurrek testified that while riding around with Wood, he observed a revolver-type handgun underneath the armrest in the center console of Wood's vehicle.

{¶ 13} Kurrek further testified that on the night of December 15, 2011, Wood called again and asked him to go shopping. When he came to pick Kurrek up, Wood was driving Turner's gray Honda Accord. Kurrek testified that Wood also had several credit cards belonging to Turner. Wood asked Kurrek if he would use Turner's credit cards to purchase Christmas gifts for Wood's sons in exchange for heroin. Kurrek agreed, and Wood drove him to several stores where he purchased several toys. Kurrek testified that Wood stayed in the car while he went into the stores and bought the gifts. Kurrek testified that at the third store he entered, he was informed that all of the credit cards belonging to Turner had been maxed out. At that point, Wood took Kurrek back home. On December 20, 2011, Turner's gray Honda Accord was found abandoned by police only two blocks from Wood's mother's residence at 610 Groveland Avenue in Dayton, Ohio. The police who found the vehicle noted that the steering column had not been "peeled" or otherwise tampered with, which is usually the case when cars are stolen. This indicated to the police that whoever had taken the vehicle and later abandoned it had the key to the vehicle.

{¶ 14} After Turner's death, Wood gained permission to stay for a short time in the basement of his friend's girlfriend, Iesha Young. Young testified that at some point after Christmas in 2011, she went down to the basement to do laundry and observed a revolver

sitting on a table. Young further testified that she attempted to pick the gun up and look at it, but Wood took the gun and told her not to touch it. Young testified that she never saw the revolver again. Young also testified that she was later informed by her cousin that the police were looking for her in connection with Wood. Young testified that after Wood overheard her conversation with her cousin, he immediately got up, left the house, and did not return. Around this same time on or about January 9, 2012, Wood called the mother of his sons, Jemika Johnson, and told her to kiss his children for him because "he won't be seeing them no more."

{¶ 15} The State also presented the testimony of Cora Williams who testified that in mid-January of 2012, she was at the home of her heroin dealer, Joseph Ramey, when Wood arrived there. Williams testified that Wood looked unusually unkempt and fidgety. Upon arriving, Wood immediately went down to the basement to speak privately with Ramey. Williams testified that she eavesdropped on the two men's conversation during which she overheard Wood say, "I put two in the motherf*****. Can you help me?"

{¶ 16} Wood was arrested by Moraine Police Officer Michael Cornely on December 20, 2012, approximately one year after the shooting of Turner. When the police first made contact with him, Wood gave the police a false name. Officer Cornely eventually identified Wood and took him into custody. When he was taken into custody, Wood asked Officer Cornely to make arrangements to give his mother his cellphone, saying, "[I am] going to be going away for a very long time."

{¶ 17} As previously discussed, Wood was found guilty on all counts and sentenced to life in prison without the possibility of parole, plus an additional twenty-three years.

{¶ 18} It is from this judgment that Wood now appeals.

{¶ 19} Wood's first assignment of error is as follows:

{¶ 20} "THE TRIAL COURT'S DECISION TO CONTINUE THE JURY TRIAL FROM JULY 26, 2013 UNTIL JANUARY 27, 2014 RESULTED IN A VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL."

{¶ 21} In his first assignment, Wood contends that the trial court erred when it granted his request for a continuance in order to locate an expert witness to refute evidence from the State regarding his cellphone records.   Specifically, Wood argues that when the continuance was granted, his right to a speedy trial was violated pursuant to R.C. 2945.71.

{¶ 22} Initially, we note that neither Wood nor his counsel raised his right to a speedy trial before the trial court.   "[A]ppellate courts of this state have consistently held that a defendant cannot raise a speedy trial issue for the first time on appeal but must initially raise such an issue at or prior to commencement of trial in accordance with R.C. 2945.73(B)." *State v. McGillvary*, 2d Dist. Miami No. 2012-CA-7, 2012-Ohio-5538, ¶ 10, citing *State v. Brown*, 7th Dist. Belmont No. 98 BA 13, 1999 WL 1138549 (Dec. 8, 1999) (Citations omitted).   Accordingly, Wood has waived his right to raise a speedy trial issue for the first time on direct appeal.

{¶ 23} Assuming, however, the speedy trial issue was properly before us, Wood's argument would still fail.   In Ohio, R.C. 2945.71 requires the State to bring a felony defendant to trial within 270 days of arrest. R.C. 2945.71(C). Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three pursuant to the triple-count provision of R.C. 2945 .71(E).   This "triple-count" provision reduces to

90 days the time for bringing to trial an accused who is incarcerated the entire time preceding trial. *State v. Dankworth,* 172 Ohio App.3d 159, 2007–Ohio–2588, 873 N.E.2d 902, ¶ 31 (2d Dist.). Pursuant to R.C. 2945.72, however, the time within which an accused must be brought to trial is extended by a period of delay caused by his own motions.

**{¶ 24}** To the extent Wood argues that his statutory right to a speedy trial was violated pursuant to R.C. 2945.71, the record establishes that the following events occurred which are tolling events: 1) motion for discovery/bill of particulars filed on March 13, 2013; 2) motion to suppress filed on May 21, 2013;[2] 3) motion for a continuance filed by Wood on July 26, 2013, in which he asserted that he needed additional time "to obtain an expert to review and verify the cellphone triangulation data" to be utilized by the State at trial. Defense counsel asserted that as of the filing of the motion for a continuance, he had just received discovery from the State pursuant to the earlier request made on March 13, 2013.

**{¶ 25}** We note that Wood contends that he never consented to the motion for a continuance filed on July 26, 2013. Wood also points out that he refused to sign the time waiver that was executed by his trial counsel. Nevertheless, it is well-established that defense counsel may request a continuance in order to obtain more time to prepare for the case without the defendant's agreement, and the defendant is bound thereby. *State*

---

[2]Defense counsel filed a continuance motion on June 5, 2013, which encompassed the dates of March 19, 2013, through May 21, 2013, ostensibly to cover an earlier oral request for a suppression hearing (as a date was journalized for a suppression hearing on March 20, 2013) yet the written motion was not filed until later on May 21, 2013. We need not address whether this late filing was an effective tolling event as the issue was not raised and preserved below.

*v. Smith*, 2d Dist. Clark No. 2003 CA 93, 2004-Ohio-6062; *State v. McBreen*, 54 Ohio St.2d 315, 376 N.E.2d 593 (1978), syllabus. Moreover, counsel could validly waive defendant's right to a speedy trial without his consent. *State v. Taylor,* 98 Ohio St.3d 27, 2002–Ohio–7017, 781 N.E.2d 72, ¶ 36. Neither Wood nor defense counsel moved to dismiss charges against him on speedy trial grounds pursuant to R.C. 2945.73(B). Thus, the delay resulting from Wood's counsel's request to continue the trial in order to obtain an expert to review the cellphone triangulation evidence should not be charged against the State for speedy trial purposes.

{¶ 26} Lastly, Wood raises a constitutional challenge with respect to his right to speedy trial. We note, however, that Wood did not raise this issue below, but even if he had, we find no constitutional speedy-trial violation resulting from the trial court's decision granting defense counsel's July 26, 2013, motion for a continuance of the trial date.

{¶ 27} The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. In *Barker,* the Supreme Court established a balancing test for determining whether a defendant's constitutional right to a speedy trial has been violated. The four factors are "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 182, 33 L.Ed.2d 101 (1972*).* "[T]hese four factors are balanced considering the totality of the circumstances, with no one factor controlling." *State v. Perkins,* 2d Dist. Clark No. 08–CA–0081, 2009–Ohio–3033, ¶ 8.

{¶ 28} As previously stated, defense counsel did not need Wood's consent to file the continuance motion nor the waiver of speedy trial time. Furthermore, considering the

number of witnesses involved, as well as the technical nature of the testimony being presented, the length of the requested continuance from July 26, 2013, until January 27, 2014, was not unreasonable under the circumstances, and therefore did not prejudice Wood.

{¶ 29} Wood's first assignment of error is overruled.

{¶ 30} "THE CONVICTION OF ALL COUNTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION BECAUSE THERE WAS NO EVIDENCE THAT THE APPELLANT MURDERED, ROBBED, BURGLED OR ASSAULTED THE VICTIM, COREY TURNER, NOR WAS THERE SUFFICIENT EVIDENCE THAT THE APPELLANT WAS EVER IN POSSESSION OF A FIREARM IN VIOLATION OF [R.C.] 2923.13."

{¶ 31} In his second assignment of error, Wood argues that the State failed to adduce any evidence during trial that he "murdered, robbed, burgled, or assaulted victim Corey Turner, nor was there sufficient evidence that [he] ever possessed a firearm in violation of §2923.13." Accordingly, Wood argues that none of his convictions are supported by sufficient evidence. Wood also asserts that his convictions are against the manifest weight of the evidence.

{¶ 32} "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley,* 2d Dist. Clark No. 2007 CA 99, 2008–Ohio–4636, ¶ 12.

**{¶ 33}** "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight,* 107 Ohio St.3d 101, 2005–Ohio–6046, 837 N.E.2d 315, ¶ 69. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.* at ¶ 71.

**{¶ 34}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

**{¶ 35}** This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 36} Wood asserts that when the jury found him guilty of the charged offenses with respect to death of Turner, it was not presented with any direct evidence of his guilt. Specifically, Wood points out that there were no eyewitnesses, no videos or recordings of the crimes being committed, no gun was ever recovered, and Wood never confessed to any involvement in Turner's death. While we agree that there was little to no direct evidence linking Wood to Turner's murder and robbery, the State presented ample circumstantial evidence which supports Wood's convictions on all of the counts in the indictment, including his own admission against interest with respect to "put[ting] two in the motherf*****."

{¶ 37} Specifically, the evidence adduced by the State circumstantially established that on the night of December 13, 2011, Wood arranged to meet Turner at his apartment. Once there, Wood shot and killed Turner with a revolver-type handgun. Wood then ransacked Turner's apartment, stealing two televisions, various electronic equipment, and credit cards belonging to the decedent. Wood also stole Turner's gray Honda Accord sedan. Wood, through the help of an acquaintance, used Turner's credit cards to buy Christmas gifts for his two sons. Significantly, two witnesses testified that they observed Wood with a revolver handgun in the days leading up to and following Turner's murder. Turner's vehicle was also found abandoned by police only a short distance away from the residence Wood shared with his mother. Wood also made several statements implicating himself in Turner's murder.

{¶ 38} Circumstantial evidence and direct evidence have equivalent probative value. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991); *State v. Reynolds,* 2d Dist. Montgomery No. 19780, 2003-Ohio-7245, ¶ 17. Consequently, a

defendant may be convicted solely on the basis of circumstantial evidence. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988). In fact, we have noted that circumstantial evidence is often more persuasive than direct evidence. *State v. Reed,* 155 Ohio App.3d 435, 2003-Ohio-6536, 801 N.E.2d 862, ¶ 56 (2d Dist.). As stated by the Supreme Court of Ohio, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

{¶ 39} In the hours leading up to Turner's death, his and Wood's phone records establish that they exchanged several phone calls, including one call witnessed by a cashier at a gas station when Turner was overheard telling Wood in an agitated tone of voice, "I said I'll be there." The phone records further establish that Wood called Turner approximately one hour later at his home. Turner then called Wood approximately twenty minutes later at 10:21 p.m. Wood's cellphone records establish that his phone was in the area of Turner's apartment during the time frame when the shooting was alleged to have occurred. Significantly, beginning at 10:26 p.m., when the last call that Turner made to Wood was ended, Wood's cellphone was either powered off or had its battery removed.

{¶ 40} When Wood's phone was turned back on, at 6:31 a.m. on December 14, 2011, an incoming call came from his mother. Agent Horan testified that when this call was received, Wood's cellphone was in close proximity to Turner's apartment. Moreover, during the time that Wood's cellphone was being used in the vicinity of the apartment, Turner's neighbor, Betty Harrison, testified that she observed Turner's gray Honda Accord being driven away from the apartment building.

{¶ 41} Next, the State presented the testimony of Ronald Kurrek, who testified that on the night of December 15, 2011, Wood called him and asked Kurrek to go shopping. When he came to pick Kurrek up, Wood was driving Turner's gray Honda Accord. Kurrek testified that Wood also had several credit cards belonging to Turner. Testimony was also adduced that Turner's apartment, which was usually very clean and organized, had been ransacked and burglarized because two television sets, as well as various electronic equipment, were missing. From this evidence, the jury could infer that after killing Turner and looting his apartment, Wood fled with Turner's credit cards and his car.

{¶ 42} Both Kurrek and Iesha Young testified that they observed Wood in the possession of a revolver in the days preceding and then following Turner's murder. The police also found two spent bullets but no shell casings at the murder scene. Thus, the jury could reasonably infer that the person who shot Turner used a revolver rather than a semi-automatic handgun. After hearing that the police would be arriving at Young's house where he was temporarily staying, Wood immediately gathered his possessions and left the premises. Wood also instructed the mother of his two sons to kiss them for him because he was wanted by the police and would not be seeing the children anymore.

{¶ 43} The State also presented the testimony of Cora Williams, who overheard Wood tell Joseph Ramey, "I put two in the motherf*****. Can you help me?" From this statement, the jury could reasonably infer that Wood was describing his involvement in Turner's murder. Moreover, the details of Turner's death and the evidence found at the crime scene were not made public. Therefore, the jury could infer that only the actual killer would know that two shots were fired. After being arrested by Moraine police on December 20, 2012, Wood asked Officer Cornely to make arrangements to give his

mother his cellphone, saying, "[I am] going to be going away for a very long time." From this statement, the jury could reasonably infer that Wood was acknowledging that he had finally been caught for Turner's murder and robbery.

{¶ 44} Construing the evidence presented in a light most favorable to the State, as we must, we conclude that a rational trier of fact could find all of the essential elements of the crimes for which Wood was indicted and found guilty to have been proven beyond a reasonable doubt. Wood's convictions for the instant offenses were therefore supported by legally sufficient evidence.

{¶ 45} Furthermore, having reviewed the record, we find no merit in Wood's manifest-weight challenge. It is well-settled that evaluating witness credibility is primarily for the trier of fact. *State v. Benton,* 2d Dist. Miami No. 2010–CA–27, 2012–Ohio–4080, ¶ 7. Here the jury quite reasonably could have credited the extensive testimony provided by the State's witnesses, applied said evidence and all reasonable inferences to the elements of the offenses, and thereafter, found Wood guilty. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice has occurred.

{¶ 46} Wood's second assignment of error is overruled.

{¶ 47} "THE OFFENSES THAT OCCURRED AT 381 FOREST PARK DRIVE SHOULD MERGE INTO A SINGLE SENTENCE."

{¶ 48} In his third assignment, Wood argues that the trial court erred when it failed to merge all of the offenses for which he was convicted into a single sentence for aggravated murder. As previously discussed, Wood was found guilty of the following charges, to wit: two counts of aggravated murder (Counts I and II); two counts of

aggravated robbery (Counts III and IV); two counts of aggravated burglary (Counts V and VI); two counts of felonious assault (Counts VII and VIII); one count of grand theft of a motor vehicle (Count IX); and three counts of having a weapon while under disability (Counts X, XI, and XII). Counts I through IX were all accompanied by a mandatory three-year firearm specification.

{¶ 49} At sentencing, the trial court merged Counts I and II, and the State elected to proceed to sentencing on Count II. The trial court also merged Counts III and IV, and the State elected to proceed to sentencing on Count IV. The trial court merged Count V into Count VI, and then merged Count VI into Count II (aggravated murder). The trial court merged Counts VII and VIII into Count II, as well. Finally, the trial court merged Counts X, XI, and XII, and the State elected to proceed to sentencing on Count XII.

{¶ 50} Therefore, Wood was ultimately sentenced on Count II (aggravated murder); Count IV (aggravated robbery); Count IX (grand theft of a motor vehicle); and Count XII (having a weapon while under disability).

{¶ 51} R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such

offenses, and the defendant may be convicted of all of them.

{¶ 52} "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, 942 N.E.2d 1061, syllabus. The Ohio Supreme Court explained:

* * * [T]he question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." * * *

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge. (Citations and quotations omitted.)

*Johnson* at ¶ 48-51.

{¶ 53} The Ohio Supreme Court recently clarified the applicable standard when

determining whether offenses merge as allied offenses of similar import. *State v. Ruff,* 143 Ohio St.3d 114, 2015–Ohio–995, 34 N.E.3d 892.

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance?; (2) Were they committed separately?; and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 30-31.

{¶ 54} Most recently in *State v. McGail*, 2d Dist. Miami No. 2014-CA-27, 2015-Ohio-5384, we stated the following:

[T]he Ohio Supreme Court addressed the allied-offense issue again in *State v. Earley*, Slip Opinion No. 2015-Ohio-4615. There the majority characterized the analysis in its earlier *Johnson* lead opinion as "largely obsolete." *Id.* at ¶ 11. The *Earley* court instead embraced *Ruff*, which, as

noted above, considers a defendant's *conduct*, his *animus*, and the *import* or significance of his offenses. Applying *Ruff*, the *Earley* court concluded that misdemeanor OVI and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Earley* at ¶ 20. For purposes of our analysis here, we note that a defendant bears the burden of establishing entitlement to merger, and we review a trial court's ruling on the issue de novo. *State v. LeGrant*, 2d Dist. Miami No. 2013-CA-44, 2014-Ohio-5803, ¶ 15.

\*\*\*

We reach the same conclusion under the *Ruff* standard, which the Ohio Supreme Court applied in *Earley*. We see nothing in *Ruff* that alters or undermines the foregoing analysis about McGail's commission of murder and aggravated robbery involving the same conduct committed with the same animus. For the reasons set forth above, we conclude that the two offenses were not committed separately and were not committed with a separate animus or motivation. These findings remain pertinent under *Ruff*, which, as noted above, provides that offenses do not merge if "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25; *see also id.* at ¶30-31.

*McGail*, at ¶ 51 & 60.

**{¶ 55}** As noted above, the counts for aggravated burglary and felonious assault

merged into Count II, aggravated murder. The only remaining issue, therefore, is whether the trial court should have merged the single remaining count of aggravated murder (Count II), the remaining count of aggravated robbery (Count IV), grand theft of a motor vehicle (Count IX), and having a weapon while under disability (Count XII).

**{¶ 56} AGGRAVATED ROBBERY**

**{¶ 57}** This court applied *Johnson* in *State v. Jackson,* 2d Dist. Montgomery No. 24460, 2012–Ohio–2335, a case in which the defendant argued, among other things, that the trial court erred in failing to merge his murder and aggravated robbery offenses. In applying *Johnson,* we concluded that "it is possible to commit murder and aggravated robbery with the same conduct." *Id.* at ¶ 140. We then examined whether the defendant did in fact commit the two offenses with the same conduct and the same animus, stating the following:

> Several courts have held that, where the force used to effectuate an aggravated robbery is far in excess of that required to complete the robbery, or where the circumstances suggest that a separate intent to kill existed, the offenses of aggravated robbery and murder do not merge. *See [State v. Diggle,* 3d Dist. Auglaize No. 2–11–19, 2012–Ohio–1583, ¶ 16] (evidence of prior conflict with victim and defendant's use of force in excess of that required to complete robbery found to demonstrate separate animus for murder); *State v. Ruby,* 6th Dist. Sandusky No. S–10–028, 2011–Ohio– 4864, ¶ 61 (beating of elderly, disabled victims demonstrated separate animus for aggravated robbery and attempted murder, because the beating far exceeded that necessary to effectuate the robbery); *State v. Tibbs,* 1st

Dist. Hamilton No. C–100378, 2011–Ohio–6716, ¶ 48 (shooting victim in face and head from close range during course of aggravated robbery demonstrated a specific intent to kill).

*Jackson* at ¶ 140.

{¶ 58} In light of these cases, we concluded in *Jackson* that the trial court could have reasonably determined that the defendant's use of force exceeded that necessary to complete the robbery or that the defendant had a separate intent to kill given that the victim was shot multiple times, with one shot being directly in the victim's head. *Id.* at ¶ 141.

{¶ 59} In the instant case, the evidence established that Wood shot Turner in the back of the head, killing him. This degree of force suggests the use of force in excess of that required to effectuate the robbery. As we found was the case in *Jackson*, the trial court here could have reasonably concluded that Wood's use of force exceeded that necessary to complete the robbery or that he had a separate intent to kill Turner. Thus, the trial court did not err in refusing to merge the aggravated murder and the aggravated robbery.

{¶ 60} **GRAND THEFT OF A MOTOR VEHICLE**

{¶ 61} We note that at sentencing, defense counsel acknowledged that his conviction for grand theft did not merge with any of his other convictions. Irrespective of defense counsel's concession at sentencing, it is apparent that the trial court did not err when it failed to merge Wood's conviction for grand theft of a motor vehicle with his conviction for aggravated murder.

{¶ 62} In the instant case, Wood committed the aggravated murder when he shot

and killed Turner in his apartment. The grand theft conviction was based upon Wood's distinct conduct in stealing Turner's motor vehicle ostensibly after committing the murder. The record does not support the conclusion that Wood shot and killed Turner in order to steal his car. Moreover, Wood did not have to kill Turner in order to steal his car. A defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. *Ruff* at ¶ 23. The harm suffered by a victim from having his car stolen is clearly separate and identifiable from the harm Turner suffered from being shot in the head and killed. Thus, the trial court did not err when it did not merge Wood's convictions for aggravated murder and grand theft of a motor vehicle.

**{¶ 63} HAVING A WEAPON WHILE UNDER DISABILITY**

**{¶ 64}** Finally, Wood argues that the trial court erred when it failed to merge his conviction for aggravated murder with his conviction for having a weapon while under disability. At sentencing, defense counsel acknowledged that his three convictions for having a weapon while under disability merged with each other but did not merge with any of his other convictions. Upon review, Wood's argument on appeal that his conviction for weapons under disability merges with the aggravated murder is without merit.

**{¶ 65}** Recently, in *State v. Skapik*, _____ N.E.3d _____, 2015-Ohio-4404, ¶ 19 (2d Dist.), we found that even assuming that a defendant's initial act of stealing firearms simultaneously constituted the offenses of theft and having weapons while under disability, the conduct for the two offenses was different. In *Skapik*, we noted that the

defendant continued to possess the firearms after the theft was completed. *Id.* Significantly, the defendant took the weapons home, arranged to sell them, and later transported them to another location, where he exchanged them for cash and heroin. *Id.* Thus, we found that the defendant's actions with respect to the stolen firearms constituted conduct separate from the initial theft. *Id.* Moreover, defendant's later acts after stealing the firearms established a separate animus and support a separate weapons-under-disability conviction. *Id.*

{¶ 66} Here, Kurrek testified that he observed Wood in possession of a revolver-type firearm in the days immediately preceding Turner's murder. Additionally, Young testified that she observed Wood in possession of a revolver when he was temporarily staying in her basement following Turner's murder. Thus, the evidence adduced at trial supports the conclusion that Wood possessed the firearm in the days preceding and following Turner's murder. Similar to the defendant in *Skapik*, Wood's conduct in possessing the firearm before and after Turner's murder constituted separate conduct, and established a separate animus, thereby supporting a distinct separate weapons-under-disability conviction. The trial court did not err when it failed to merge Wood's conviction for aggravated murder with his conviction for having weapons while under disability.

{¶ 67} Wood's third assignment of error is overruled.

{¶ 68} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT SENTENCED APPELLANT TO LIFE IN PRISON WITHOUT THE POSSIBILITY OF PAROLE PLUS TWENTY-THREE ADDITIONAL YEARS IN PRISON AND ORDERED THAT A MAJORITY OF THE COUNTS BE SERVED CONSECUTIVELY."

{¶ 69} In his fourth assignment, Wood argues that the trial court abused its discretion when it ordered that the sentences imposed for each of Wood's convictions be served consecutively, for an aggregate prison term of life in prison without the possibility of parole, plus twenty-three years. Based on the length and severity of the sentence imposed, Wood asserts that the trial court acted in a vindictive manner and therefore abused its discretion.

{¶ 70} Before imposing a consecutive sentence, a trial court is required to find that: (1) "consecutive service is necessary to protect the public from future crime or to punish the offender"; (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and (3) any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 71} Before imposing sentence, the trial court stated that it had specifically considered Wood's presentence investigation report, which revealed a lengthy felony criminal record dating back to 1998. On April 2, 1998, Wood was convicted of kidnapping, attempt to commit rape, and carrying a concealed weapon. Wood served seven years in prison and was designated a sex offender. On May 14, 2007, Wood was convicted of possession of cocaine, and he was sentenced to five years of community control supervision. On June 14, 2007, Wood was convicted of failure to register as a sex offender. He was initially sentenced to five years of community control supervision, but after absconding, his community control was revoked, and he was sentenced to one year in prison. On February 26, 2009, Wood was convicted of trafficking in heroin in the vicinity of a school for which he was sentenced to one year in prison. Finally, on August 26, 2013, Wood was convicted of failure to verify, and he was sentenced to one year in prison. Wood was released on December 19, 2013, to post-release control with active supervision. Undoubtedly, Wood's prior felony convictions weighed heavily in the trial court's calculus in determining whether to impose consecutive sentences.

{¶ 72} Moreover, the record clearly establishes that the trial court made all of the requisite findings to support the imposition of consecutive sentences. (Tr. 1352, Vol.VI). When imposing consecutive sentences, the trial court stated the following:

> The Court has imposed consecutive sentencing and must find the following. The Court finds that consecutive sentencing is necessary to protect the public from future crime by you and also it is necessary to punish you. Consecutive sentencing is not disproportionate to the seriousness of

your conduct and to the danger that you pose to the public.

In addition, your history of criminal conduct demonstrates that consecutive sentencing is necessary to protect the public from future crime by you.

{¶ 73} In light of the foregoing, we find that the record supports the trial court's imposition of consecutive sentences.

{¶ 74} Wood's fourth assignment of error is overruled.

{¶ 75} "THE PRETRIAL PHOTO IDENTIFICATION OF THE APPELLANT BY PASTOR EARL HARRIS WAS IMPERMISSIBLY SUGGESTIVE AND/OR UNRELIABLE [sic] THUS SHOULD HAVE BEEN SUPPRESSED."

{¶ 76} In his final assignment, Wood argues that the trial court erred when it overruled his motion to suppress as it related to his pre-trial identification by Pastor Earl Harris from the AME Church. Wood asserts that since Harris was not shown several photos in a spread, but only one photo, the procedure leading to identification was unreliable and impermissibly suggestive and should have been suppressed.

{¶ 77} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual

findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Hurt,* Montgomery App. No. 21009, 2006–Ohio–990, ¶ 16.

*State v. Purser,* 2d Dist. Greene No. 2006 CA 14, 2007–Ohio–192, ¶ 11.

**{¶ 78}** To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances. *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

**{¶ 79}** In *State v. Sherls,* 2d Dist. Montgomery No. 18599, 2002 WL 254144 (Feb. 22, 2002), this Court addressed the issue of suggestive photographic confrontations:

In many cases, and in almost all cases in which the criminal offender is not known to his victim or other eyewitnesses and is not arrested at the time of the crime, those who witness the crime are asked to identify the perpetrator for purposes of police investigation through some form of confrontation. This confrontation may be in the form of a "lineup," a one-on-one "show up," or from a photograph or series of photographs displayed to the witness. When any of these systems of confrontation suggest, due to

the manner or mode of their presentation, that one individual is more likely than others to be the perpetrator of the crime, that fact increases the likelihood of misidentification and violates the right to due process of law of a defendant so identified. Identification testimony that has been tainted by an unduly or  unnecessarily suggestive out-of-court  confrontation  may  be suppressed on that basis.

However,  even  when  a  confrontation  is  unnecessarily or unduly suggestive,  the  identification  testimony  derived  from  the confrontation  is  not  inadmissible  solely  for  that  reason.  Reliability  of  the testimony  is  the  linchpin  in  determining  its  admissibility.  So  long  as  the identification possesses sufficient aspects of reliability, there is no violation of due process.

Reliability is determined from the totality of the circumstances. These circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation,  and  the  time  between  the  crime  and  the  confrontation. Against  these  factors  is  to  be  weighed  the  corrupting  effect  of the suggestive identification itself.

The foregoing due process concerns are implicated only if and when a confrontation is unnecessarily or unduly suggestive. That prospect usually arises when the witness has been shown but one subject, whether in a "show-up" * * * *or a single photograph* * * *. Similarly, if the witness is shown

pictures or photographs of several persons in which the photograph of one recurs or is in some way emphasized, undue suggestion may occur. However, even when the confrontation process is unduly or unnecessarily suggestive, the later identification testimony should not be excluded so long as the identification itself is reliable.

*Id.* at *3, 4.

{¶ 80} At the motion to suppress hearing, Montgomery County Sheriff's Detective Brad Daugherty testified that as part of the investigation into Turner's death, he reviewed the victim's phone records. From the phone records, Det. Daugherty became aware that Turner had been in contact with Wood in the days and hours leading up to the homicide. Det. Daugherty also recovered a voicemail message that Wood left for Turner in which he stated that he was across the street from "the church." Det. Daugherty assumed that "the church" mentioned by Wood was the AME Church because that was the only church with which Turner was known to be associated.

{¶ 81} At that point in his investigation, Det. Daugherty was simply following leads in the murder case. On January 6, 2012, Det. Daugherty went to the AME Church in order to speak with Harris and show him a photograph of Wood to see if he had any connection to the church. Regarding his discussion with Harris, Det. Daugherty provided the following testimony:

The State: *** I want to direct your attention to the date of January 6, 2012[.] And can you share with us, did you have occasion to show the photograph in State's [Ex.] 10 to an individual by the name of Earl Harris?

Det. Daugherty: Yes.

Q: And what was the purpose of showing Mr. Harris the single photograph on that particular day?

A: The victim in this case, Corey Turner, was a – the choir director and Christmas play director at this – the Greater Allen Church in Dayton. Earl Harris is the pastor of that church so I took Shawn Wood's picture over to show him to see if he recognized Shawn Wood as attending the church.

Q: When you showed Pastor Harris the photograph, Detective, was anyone present with you and the pastor when you showed him the photo?

A: I think Detective Steele was with me, but there was no – no – no one else like no lay people at the time.

Q: And when you showed the pastor the photograph, did you give him any instructions? Did you say anything to him specifically?

A: *I just said have you ever seen this guy at the church or do you recognize this guy?*

Q: Okay. And what, if any, response did he give you?

A: He indicated that it appeared to be – he said that a gentleman had came in the Sunday before so we're talking like I believe December 10th, had came into the church asking for money and the reason he remembered this particular individual is because they were in the finance room counting the offering that had came in that day and this guy walked into the room where they were counting the offering. And the – the pastor said he was kind of alarmed because there was quite a bit of money out on the table that they were counting and this guy just kind of waltzes in there. So he said he

believes that is the same guy that he saw on that day.

Q: After you showed – did you make any requests that Pastor Harris mark the photo in any way?

A: No. ***.

**{¶ 82}** Initially, we note that Harris was not a witness to Turner's murder, nor does the record contain any evidence which establishes that Det. Daugherty said anything to Harris to suggest that Wood was the perpetrator. Det. Daugherty showed Harris a single photograph of Wood and simply asked him if he recognized the man. We conclude that only showing Harris *one* photograph of a suspect in the homicide was inherently suggestive.[3]

**{¶ 83}** Nevertheless, even if the single photo was unduly suggestive, the circumstances of this case indicate that Harris' identification of Wood was itself sufficiently reliable. At the suppression hearing, Harris provided the following testimony regarding his brief encounter Wood:

The State: Now, on the particular day of December the 11th of 2011, was there anything out of the ordinary that occurred on that particular day that makes you recall that Sunday, as opposes to any other given Sunday?

Harris: One of the [church] officers came to the door *** to tell me that there was someone at the door that needed to see me. And then as I moved toward the door, this other person [Wood] really kind of moved past him

---

[3]We note that in his motion to suppress, Wood did not raise any issue with respect to noncompliance with the photo-lineup procedures outlined in R.C. 2933.83(C). Nevertheless, the trial court provided the proper instructions to the jury as outlined in R.C. 2933.83(C).

right and – and right to that door, that first door.

Q: That door to your office?

A: To my office, yes.

Q: Is that a normal scenario?

A: No, it isn't.   *** Normally, when persons do that, and it doesn't happen that often, normally, they stay back in the foyer where, you know, everybody else is kind of gathered.

***

Q: And did you have a conversation with this person at the time?

A: I did, and the gentleman was telling me that he was in need of some help, that he – that one of the members had given him some money.   Apparently, he had identified Phyllis Caldwell who was a retired teacher, who's a member of the congregation, and he mentioned her by name, so that kind of caught my attention.   *** And that she had given him ten dollars or something like, but that he needed some more – he need some more help.

***

Q: Okay.   Okay.   Did this person have anything on their head, wearing any kind of hat, or anything of that nature?

A: No.

Q: Okay.   How long do you think your conversation with this individual lasted?

A: Certainly not more than two minutes.

Q: Okay.   Were you in a well-lit area of the church standing there kind of at

your office door?

A: Yes, once you come into the office and past that threshold it's fluorescent lights.

Q: You're putting your hands up, like the lights here in the courtroom?

A: Yes.

Q: Okay.  And were you face to face with this person having this conversation?

A: Yes.

Q: And by face to face –

A: And it –

Q: -- how many feet do you think were in between you?

A: Three or four feet and –

Q: Okay.

{¶ 84} Based on the totality of the circumstances, we agree with the trial court that Harris' pre-trial identification of Wood as the man who sought financial assistance at the church on December 11, 2011, was inherently reliable.   Therefore, the trial court did not err in denying Wood's motion to suppress as it related to Harris' pre-trial identification testimony.

{¶ 85} When Harris spoke to Wood in his church office on December 11, 2011, the men stood face to face in a well-lit area and were no more than three to four feet from one another.   Wood and Harris spoke for about two minutes in the early afternoon, and there was nothing obstructing Harris' view of Wood while they conversed.   In reviewing the circumstances surrounding Harris' identification of Wood in this case, we agree with

the trial court that there was not "a very substantial likelihood of irreparable misidentification." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *5 (Feb. 22, 2002). Accordingly, we conclude that while only showing Harris *one* photograph of Wood was inherently suggestive, Harris' pre-trial identification of Wood was sufficiently reliable to overcome that impediment.

{¶ 86} Wood's fifth and final assignment of error is overruled.

{¶ 87} All of Wood's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J., concurs.

WELBAUM, J., concurring.

{¶ 88} I concur with most of the majority opinion, but write separately to express my disagreement with one point that the majority discusses. Specifically, at ¶ 81-83, the majority concludes that showing Pastor Harris only one photograph of a suspect in the homicide was unduly suggestive, but that Harris' identification was sufficiently reliable. I agree that the identification was reliable. However, we do not need to reach this determination, because the process used was not unduly suggestive of Wood's guilt.

{¶ 89} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992), citing *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). (Other citation omitted.) "Under *Neil's* two-pronged test, the first question is whether the

identification procedure was unnecessarily suggestive." *Id.*

{¶ 90} In the usual situation, victims or witnesses to crimes are shown photographs to see if they can identify the perpetrator, and the process is later challenged in court because it was unnecessarily suggestive. If the process is found to be suggestive, then the court focuses on whether the identification was, nonetheless, reliable.

{¶ 91} In the case before us, however, Detective Daugherty was simply pursuing leads and did not suggest that Wood was the perpetrator of a crime. Instead, the detective wanted to know if the pastor recognized Wood as having attended the church. Furthermore, there is no indication that Pastor Harris was a witness to any crime. As a result, the identification process was not suggestive of Wood's guilt.

{¶ 92} After Daugherty asked if Harris recognized "this guy," Harris said yes, and further explained that the person had come to the church about three weeks earlier asking for money. Again, the display of one photo of Wood was not suggestive in violation of the due process clause, because due process requires a court to suppress an identification of the suspect *only* "*if the confrontation was unnecessarily suggestive of the defendant's guilt * * * ."* (Emphasis added.) *Waddy* at 438.

{¶ 93} To rule that the identification is suggestive under these circumstances means that police would have to construct photo spreads when they are conducting routine investigations to gather information about crimes. In my opinion, that is an unwarranted extension of *Biggers*.

{¶ 94} For example, in *State v. Carter*, 5th Dist. Stark No. 2002CA00125, 2003-Ohio-1313, the police made still photographs of a robbery from a video-tape and showed

the photos to various police officers. A copy of one photo was also published in the newspaper. *Id.* at ¶ 11. After several officers identified the photo as being that of the defendant, the investigating officer prepared a photographic lineup to show to the victim who had been robbed. *Id.* The police department had also received anonymous phone calls identifying the photograph as being that of the defendant. *Id.* at ¶ 18. The victim identified the defendant, who was then arrested and charged with the robbery. *Id.* at ¶ 12.

{¶ 95} In the trial court and on appeal, the defendant challenged the photographic lineup as having been unduly suggestive. *Id.* at ¶ 40. If the reasoning in the majority opinion is applied to the circumstances in *Carter,* the defendant would also have argued that the identification by the police officers who saw his photo, or the publication of the photo in the newspaper, which also led to his arrest, was unduly suggestive. However, he did not challenge these procedures, presumably because this type of preliminary police investigation is commonplace. If the majority opinion is read to require photographic arrays whenever leads are being followed, crime investigations will be unreasonably hampered. This is not the point of *Biggers* and its progeny.

{¶ 96} "The practice of showing only one photograph to a potential eyewitness is not encouraged; however, such measures have been shown to be both reliable and necessary." *State v. Bryant,* 5th Dist. Delaware No. 12CAA120088, 2013-Ohio-4446, ¶ 33, citing *State v. Battee,* 72 Ohio App.3d 660, 595 N.E.2d 977 (11th Dist.1991). With respect to the first prong of the *Biggers* test, "[t]he issue * * * is whether the identification procedure used was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." (Citations omitted.) *State v. Moon,* 2d Dist. Montgomery

No. 25061, 2013-Ohio-395, ¶ 30.

{¶ 97} The key word in this context is "eyewitness." Typically, identification procedures take on critical significance when a defendant is being identified by a victim or an eyewitness to the crime. R.C. 2933.83, which provides "[m]inimum requirements for live lineup or photo lineup procedures," reflects this view. Specifically, R.C. 2933.83 contains certain procedures that must be followed when suspected perpetrators are displayed to "eyewitnesses" in either photo or live lineups. R.C. 2933.83(A)(4) defines an "eyewitness" as "a person who observes another person at or near the scene of an offense." There is no indication in the record that Pastor Harris was an eyewitness, i.e., that he observed Wood at or near the scene of an offense.

{¶ 98} If the police fail to comply with the statutory requirements in R.C. 2933.83, evidence of the failure to comply shall be considered in adjudicating motions to suppress, and is also admissible in support of any claim of eyewitness misidentification. R.C. 2933.83(C)(1) and (2). We have stressed that "although R.C. 2933.83(C)(1) provides that the trial court must consider non-compliance with the provisions of the statute in adjudicating a motion to suppress eyewitness identification testimony, it does *not* provide that non-compliance, by itself, requires suppression of the testimony." (Emphasis sic.) *Moon* at ¶ 28.

{¶ 99} Again, Pastor Harris was not an eyewitness to a crime. There is no indication in the record that he observed Wood at or near the scene of the murder. To the contrary, Harris simply saw Wood at the church a few days before the murder. Accordingly, there is no need to apply *Biggers* to this case.

{¶ 100} For the reasons stated, I very respectfully disagree, in part, with the

majority opinion.

. . . . . . . . . .

Copies mailed to:

Andrew T. French
Christopher A. Deal
Hon. Richard Skelton