[Cite as *State v. Stanaford*, 2019-Ohio-1377.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27940 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-3039 |
| | : | |
| RANDY STANAFORD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of April, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

THOMAS M. KOLLIN, Atty. Reg. No. 0066964, 3725 Pentagon Boulevard, Suite 270, Beavercreek, Ohio 45431
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Randy Stanaford appeals his conviction and sentence for one count of kidnapping (sexual activity) (sexually motivated specification), in violation of R.C. 2905.01(A)(4), a felony of the first degree, and one count of rape (child under 13 years of age), in violation of R.C. 2907.02(A)(1)(b), also a felony of the first degree. Both counts were accompanied by a sexually violent predator specification. Stanaford filed a timely notice of appeal with this Court on March 14, 2018.

{¶ 2} The incident which forms the basis for Stanaford's conviction occurred on the morning of September 26, 2016, when the 11-year old victim, K.C. left her residence to walk to her school bus stop. P.S., K.C.'s guardian, testified that the house where they resided together was five or six houses down from the intersection where the bus stop was located. K.C. testified that, as she waited for her bus to arrive, she observed an individual walking back and forth from the corner of the street to a nearby alley. K.C. described the individual as a white male in his 40s with long hair and a beard, who was wearing a red hat, jeans, and a black shirt. K.C. also testified that the man was carrying a red string backpack. K.C. testified that the man made her uncomfortable, so she moved closer to the street by her bus stop.

{¶ 3} Shortly thereafter, K.C. testified that someone grabbed her by the neck from behind and placed a hand over her mouth so she could not call for help. The perpetrator picked K.C. up from the ground and carried her to the side of a nearby house. K.C. testified that she tried to turn around in order to see her attacker, but the man told her not to do so and threatened her life. The perpetrator pressed a knife to K.C.'s throat, pulled

down her pants and underwear, and inserted two fingers inside her vagina. The perpetrator then took K.C.'s hand and forced her to touch his exposed penis. Thereafter, the perpetrator made K.C. kneel down on the ground and count to ten. Once the perpetrator had fled from the scene, K.C. stood up and ran back to her residence.

{¶ 4} Upon returning home, K.C. immediately informed P.S. that she had been assaulted. P.S. testified that upon returning home, K.C. appeared to be in a disheveled state, with dirt on her hands and knees, and she was shaking. P.S. directed her oldest daughter to call 911, while she ran outside to see if she could locate the perpetrator. K.C. spoke to the 911 operator and reported that she had just been assaulted.

{¶ 5} Dayton Police Officer Scott Carico was the first officer to respond to the 911 call. Upon arriving, Officer Carico spoke to K.C. and P.S. regarding the incident. K.C. directed Officer Carico to the area where the perpetrator had taken her. Officer Carico testified that he observed imprints in the grass that resembled knee indentations. Officer Carico testified that he also observed grass stains on K.C.'s pants in the knee area which matched the indentations on the ground where she was assaulted.

{¶ 6} After he interviewed her, Officer Carico transported K.C. and P.S. to Dayton Children's Hospital. After arriving at the hospital, K.C. was examined by a Pediatric Sexual Assault Nurse Examiner (P-SANE) Jean Williams. At the beginning of the examination, K.C. told Williams about the sexual assault. Williams then prepared a rape kit in which she placed swabs taken from K.C., as well as the clothes K.C. was wearing during the assault. Williams testified that during the examination, she found grass and petechiae in K.C.'s vagina and a candy wrapper in her hair.

{¶ 7} K.C.'s rape kit and her clothes were then sent to the Miami Valley Regional

Crime Lab for DNA testing. DNA Forensic Scientist Emily Draper analyzed the swabs and K.C.'s clothes in order to determine if any DNA was present. While the vaginal swabs were negative for the presence of semen, the analysis of K.C.'s underwear was positive for the presence of semen and showed a mixed DNA profile. Furthermore, Draper's analysis revealed a partial male DNA profile. Draper entered the male DNA profile into the national database, and it indicated defendant-appellant Stanaford as a possible suspect.

{¶ 8} On September 29, 2016, the Dayton Police Department contacted Stanaford's parole officer, Leon Medvec, and requested his assistance in locating Stanaford, who was homeless at the time these events occurred. Medvec testified that he drove around areas of Dayton that he knew Stanaford to frequent and eventually located him on North Main Street. Medvec then contacted Dayton Police Detective Hollie Bruss, who responded to Stanaford's location. Detective Bruss testified that once she located Stanaford, she stopped him and then searched him. Stanaford had a knife and a cell phone in his possession.

{¶ 9} Stanaford was transported to the Dayton Police Safety Building, where he was interviewed by Detective Bruss and Detective Joshua Spears. Stanaford denied ever being in the area where the incident occurred on September 26, 2016. As the interview was coming to a close, Detective Bruss obtained Stanaford's consent to collect a DNA sample from him for testing at the crime lab; Stanaford was then taken to jail. Detective Spears took possession of Stanaford's phone and sent it to Dayton Police Binary Intelligence for a forensic download. Draper testified that she compared the original DNA sample taken from K.C.'s rape kit to the sample provided by Stanaford after

being taken into custody. Draper testified that the DNA samples were found to be a match to a reasonable degree of scientific certainty.

{¶ 10} On October 7, 2016, Stanaford was indicted for one count of kidnapping (sexual activity) (sexually motivated specification) and one count of rape (child under 13 years of age). As previously stated, each count was accompanied by a sexually violent predator specification. At his arraignment on October 13, 2016, Stanaford stood mute, and the trial court entered a plea of not guilty on his behalf.

{¶ 11} On November 11, 2016, Stanaford filed two motions to suppress regarding his identification, search, seizure, and his alleged consent to collect his DNA. On November 15, 2016, Stanaford filed a third motion to suppress with respect to the search warrant granted to the police to examine the digital contents of the cell phone found in his possession. A hearing on all of Stanaford's motions to suppress began on November 30, 2016, and concluded on December 9, 2016, at which point the trial court took the matter under advisement. On January 4, 2017, the trial court overruled the motions to suppress on the record, and it journalized its decision on January 13, 2017.

{¶ 12} On October 17, 2017, Stanaford filed a motion to sever and/or bifurcate the sexually violent predator specifications and to have the specifications tried to the bench. The trial court granted Stanaford's motion to sever, and the case proceeded to a jury trial on October 23, 2017. At the conclusion of the trial on October 27, 2017, Stanaford was found guilty of both counts in the indictment. On January 29, 2018, the bench trial regarding the sexually violent predator specifications began. At the conclusion of the bench trial, the trial court took the matter under advisement. On February 5, 2018, the trial court found Stanaford guilty of both specifications.

{¶ 13} On February 27, 2018, the trial court sentenced Stanaford to 15 years to life in prison for kidnapping and life in prison without the possibility of parole for rape. Furthermore, the trial court ordered that the sentences be served consecutively, and Stanaford was designated a Tier III Sex Offender.

{¶ 14} It is from this judgment that Stanaford now appeals.

{¶ 15} Stanaford presents five assignments of error on appeal. Because of the nature of his arguments, we will address these assignments in the order which facilitates our discussion, rather than in the order of their presentation.

{¶ 16} Stanaford's second assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS.

{¶ 17} In his second assignment, Stanaford contends that the trial court erred when it overruled his motion to suppress. Specifically, Stanaford argues that the evidence adduced at the suppression hearing established that he did not provide a valid waiver of his *Miranda* rights before being interviewed by the police because he was suffering from sleep deprivation and also under the influence of illegal drugs. Stanaford also argues that his consent to provide a DNA sample to Detective Bruss was invalid.

{¶ 18} Appellate "review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. As the trier of fact, a trial court "is in the best position to weigh * * * evidence * * * and evaluate [the credibility of] witness[es]," so an "appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning,* 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). Accepting the trial court's findings of

fact as true, "the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* at ¶ 8.

**{¶ 19}** "A suspect's decision to waive his Fifth Amendment privilege is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Dailey*, 53 Ohio St.3d 88, 559 N.E.2d 459 (1990), paragraph two of the syllabus. Statements made after a voluntary waiver of rights are "presumed to be voluntary." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 31.

**{¶ 20}** "Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues." *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 30. Generally, statements made to police after a knowing, intelligent, and voluntary waiver of an individual's *Miranda* rights are presumed voluntary. *Id.* at ¶ 31. However, "[t]he *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any actual coercion police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession." *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio-4627, 897 N.E.2d 1149, ¶ 14 (2d Dist.). Therefore, "[r]egardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 11.

{¶ 21} When making a determination regarding whether a valid waiver has occurred, we must "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 22} Initially, we note that we have reviewed the video recording of Stanaford's interview, which occurred at the Safety Building on September 29, 2016. Regarding his *Miranda* rights, the record establishes that prior to being interviewed by Detectives Bruss and Spears, Stanaford was properly informed of his rights, and he waived those rights when he signed a pre-interview form. At the time of the interview, Stanaford was 40 years old and had obtained his GED. Stanaford also indicated to the detectives that he had previously been informed of his *Miranda* rights. The interview lasted approximately two hours, from 5:45 p.m. to 7:45 p.m. At no point during the interview did either Detective Bruss or Spears act in a threatening or coercive manner, and they did not make any promises to Stanaford. Significantly, Detective Bruss testified that Stanaford did not appear to be under the influence of any alcohol or drugs and that he answered the questions posed to him appropriately. Detective Bruss testified that, while she could not recall exactly what Stanaford had said about his drug use, he appeared coherent and was able to answer her questions clearly and appropriately. Based upon our own review of the video recording of Stanaford's interview, we find nothing to indicate that he was either intoxicated or under the influence of drugs when he was questioned by Detectives Bruss

and Spears.

{¶ 23} Under the totality of the circumstances, the record is clear that Detective Bruss carefully and completely advised Stanaford of his rights, that he understood those rights, and that he knowingly and voluntarily chose to waive them and speak to Detectives Bruss and Spears without an attorney. The trial court thoroughly considered the evidence that was presented at the suppression hearing, and the record supports the trial court's conclusions.

{¶ 24} The record further establishes that after the interview, Stanaford gave the detectives consent to take a DNA sample from him. The detectives presented Stanaford with a consent for DNA form. After the detectives explained why a DNA sample was necessary, Stanaford signed the form and provided a sample. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.' " *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden is on the prosecution to demonstrate consent, and that burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶ 25} In order to fulfill its burden, the state has to prove by clear and convincing evidence that the consent was freely and voluntarily given. *Schneckloth* at 248-49. Clear and convincing evidence is evidence "which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will provide in the mind of the trier of facts a firm belief

or conviction as to the facts sought to be established." *Cincinnati Bar Assn. v. Massengale*, 58 Ohio St.3d 121, 122, 568 N.E.2d 1222 (1991), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954).

**{¶ 26}** Here, the trial court found no coercion when Stanaford waived of his *Miranda* rights or when he signed the consent for DNA form. The fact that Stanaford signed a written waiver is strong proof that the waiver was valid. *State v. Mayberry*, 2014-Ohio-4706, 22 N.E.3d 222, ¶ 17 (2d Dist.); *see also State v. Jackson*, 5th Dist. Richland No. 2012-CA-20, 2012-Ohio-5548, ¶ 35 (determining that defendant's signing of a written consent form was "strong proof" that she voluntarily gave police officers consent to search a house). We conclude that the findings by the trial court were supported by the record, as the record indicates that Stanaford knowingly, intelligently and voluntarily consented to provide a DNA sample. Prior to signing the consent form, it was read aloud to him. Because Stanaford knowingly and voluntarily consented to have DNA taken, the trial court did not err when it overruled his motion to suppress in this regard.

**{¶ 27}** Stanaford's second assignment of error is overruled.

**{¶ 28}** Because they are interrelated, we discuss Stanaford's third and fourth assignments of error together as follows:

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR ACQUITTAL BECAUSE THERE WAS INSUFFICIENT EVIDENCE FOR A REASONABLE FACT FINDER TO FIND THAT THE APPELLANT WAS GUILTY BEYOND A REASONABLE DOUBT.

THE TRIAL COURT ERRED IN FINDING THE APPELLANT GUILTY BECAUSE THE CONVICTIONS WERE AGAINST THE

MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 29} In his third assignment, Stanaford argues that the trial court erred when it overruled his Crim.R. 29 motion for acquittal because the evidence adduced by the State was insufficient to support his convictions for rape and kidnapping. In his fourth assignment of error, Stanaford argues that the trial court's guilty verdicts were against the manifest weight of the evidence.

{¶ 30} Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense. "Reviewing the denial of a Crim.R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim." *State v. Witcher*, 6th Dist. Lucas No. L-06-1039, 2007-Ohio-3960. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted.) *State v. Crowley*, 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 31} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 69. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised

only in the exceptional case in which the evidence weighs heavily against the conviction.' " (Citations omitted.) *Id.* at ¶ 71.

**{¶ 32}** The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

**{¶ 33}** This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

### Identification Evidence

**{¶ 34}** In his third assignment, Stanaford essentially argues that there was insufficient evidence to prove that he was properly identified as the suspect who kidnapped and raped K.C.

**{¶ 35}** In *State v. Tate,* 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, the Ohio Supreme Court stated:

>        Every criminal prosecution requires proof that the person accused of
> the crime is the person who committed the crime. This truism is reflected in

the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991). The relevant question in a sufficiency-of-the-evidence review is whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*Id.* at ¶ 15.

**{¶ 36}** Here, Stanaford argues that, because K.C. was not shown a photospread or asked to identify him at any time prior to trial, a reasonable fact finder could not find that he was properly identified as the perpetrator. However, viewing the evidence in the light most favorable to the State, we find sufficient evidence to support the jury's conclusion that Stanaford was the individual who abducted and raped K.C. at knifepoint on September 26, 2016. When interviewed by Officer Carico right after the assault, K.C. described her attacker as a white male in his 40s with long hair and a beard, who was wearing a red hat, jeans, and a black shirt. K.C. also testified that the man was carrying a red string backpack.

**{¶ 37}** At the time of his arrest three days later on September 29, 2016, Stanaford met the physical description of the attacker provided by K.C., although the clothing he was wearing did not match the description. He was also found to be in possession of a

knife, and the sexual assault occurred at knifepoint. Detective Bruss testified that after interviewing Stanaford, she was able obtain surveillance video from a Montgomery County facility in which Stanaford was depicted four hours after the attack occurred. In the surveillance video, Stanaford can be seen holding a red string backpack.

**{¶ 38}** Most significant, however, was the DNA evidence collected from K.C.'s underwear which linked Stanaford to the rape. As previously stated, DNA Forensic Scientist Emily Draper analyzed the swabs from the rape kit and K.C.'s clothes in order to determine if any DNA was present. The analysis of K.C.'s underwear was positive for the presence of semen, thereby revealing a partial male DNA profile. Draper entered the male DNA profile into the national database, and it indicated defendant-appellant Stanaford as a possible suspect. Draper testified that she then compared the original DNA sample taken from K.C.'s rape kit to the sample provided by Stanaford after being taken into custody. Draper testified that the DNA samples were found to be a match to a reasonable degree of scientific certainty. From all of the evidence adduced, a reasonable jury could have found beyond a reasonable doubt that Stanaford was the individual who committed the offenses of which he was convicted.

### Stanaford's Rape Conviction

**{¶ 39}** Stanaford was found guilty of rape in violation of R.C. 2907.02(A)(1)(b), which provides:

No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶ 40} R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 41} After arriving at the hospital, K.C. was examined by Pediatric Sexual Assault Williams. At the beginning of the examination, K.C. told Williams about the sexual assault. Williams then prepared a rape kit in which she placed swabs taken from K.C., as well as the clothes K.C. was wearing during the assault. Williams testified that, during the examination, she found grass and petechiae in K.C.'s vagina. Williams testified that petechiae are caused by broken capillaries that are usually caused by force. Williams also testified that petechiae are indicators of sexual abuse which she had observed before in separate cases of sexual abuse. Additionally, Williams testified that finding a piece of grass inside K.C. vagina would be consistent with the sexual assault occurring on grass.

{¶ 42} Dr. Dale Evans, the attending physician at Dayton Children's Hospital when K.C. was admitted, testified that he observed indications of trauma within K.C.'s vagina consistent with the narrative K.C. had disclosed to Williams. Dr. Evans also testified that he believed that the nature of K.C.'s injuries was consistent with digital penetration. Viewing the evidence in the light most favorable to the State, we find sufficient evidence to support the jury's conclusion that Stanaford was guilty of rape.

**Stanaford's Kidnapping Conviction**

{¶ 43} R.C. 2905.01(A)(4) provides that "[n]o person, by force, threat, or deception, or, in the case of a victim under the age of thirteen * * *, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o engage in sexual activity * * * with the victim against the victim's will."

{¶ 44} K.C., who was 11 years-old at the time of the assault, testified that an individual, later identified as Stanaford, grabbed her by the neck from behind as she waited at the bus stop and placed a hand over her mouth so she could not call for help. The perpetrator picked K.C. up from the ground and carried her to the side of a nearby house. K.C. testified that she tried to turn around in order to see her attacker, but the man told her not to do so and threatened her life. The perpetrator pressed a knife to K.C.'s throat, pulled down her pants and underwear, and inserted two fingers inside her vagina. In support of her testimony that she had been forcibly moved from the bus stop, K.C. testified that she took Officer Carico to the location where she was assaulted, and there the officer observed imprints in the grass that K.C. explained were made by her knees. Officer Carico testified that he indeed observed the imprints in the grass on the side of the house, as well as the grass stains on K.C.'s knees. P.S. and Williams, the nurse, also testified that they observed grass stains on K.C.'s pants. Moreover, P.S. testified that the grass stains were not present when K.C. left for school earlier that morning. Furthermore, K.C. testified that Stanaford ordered her to stay put and "count to ten" as he fled.

{¶ 45} In our view, K.C.'s testimony was consistent with and corroborated by physical evidence and the testimony of P.S., Officer Carico, and Williams. Viewing the

evidence in the light most favorable to the State, we find sufficient evidence to support Stanaford's conviction for kidnapping.

**Stanaford's Sexually Violent Predator Specifications**

**{¶ 46}** The trial court found Stanaford guilty of two sexually violent predator specifications in violation of R.C. 2941.148(A). R.C. 2971.01(H)(1) defines a "sexually violent predator" as "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(2)(a)-(f) lists the factors that may be considered by the factfinder as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses. It provides:

(a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more

victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**{¶ 47}** During the bench trial, the State adduced evidence regarding a criminal case out of Middletown, Ohio, involving Stanaford in June 2008. Specifically, Stanaford was found to have been watching a young girl, D.W., ride a bicycle around her neighborhood. When she eventually rode past Stanaford, he attempted to grab her. D.W. was able to escape, and she went and told her parents what had happened. The parents chased Stanaford until he was able to get into a motor vehicle and flee the scene.

**{¶ 48}** During the investigation into the incident, police officers executed a search warrant at the residence of Stanaford's mother, where he had been living. During the search, videotapes were found in the attic which contained approximately four hours of recordings depicting young girls playing in public areas, filmed by Stanaford. When interviewed by the Middletown police, Stanaford admitted to the incident involving D.W. and to making the videotapes for the purpose of his own sexual gratification. During the same interview, Stanaford admitted to breaking into a home in April 2008 and stealing underwear belonging to a young girl he had observed outside the residence a short time before.

**{¶ 49}** Thereafter, Stanaford pled guilty to attempted kidnapping (sexual activity) and public indecency in the Butler County Court of Common Pleas. The burglary charge

was dismissed. As a result of his convictions, Stanaford was sentenced to six years in prison and designated as a Tier III sex offender.

{¶ 50} Medvec, Stanaford's parole officer, also testified at the bench trial. Medvec testified that Stanaford committed two violations while on parole. The first violation occurred when Stanaford was removed from the computer library at Sinclair Community College in Dayton, Ohio, for viewing pornography on a computer. The second violation occurred when pornography and images of children were discovered in Stanaford's residence. As a result of the parole violations, Stanaford was returned to prison for 165 days.

{¶ 51} Detective Spears testified regarding evidence that was retrieved after a forensic download from Stanaford's cell phone, which had been taken from him at the time of his arrest in the instant case. Specifically, the download revealed that the phone had been used to access several pornographic websites and other related material on September 28 and 29, 2016. Additionally, the download disclosed that the phone had been used to download approximately 1,133 images, many of which were pornographic in nature. When Stanaford was interviewed by Detectives Bruss and Spears, he indicated that the cell phone in question had been in his possession on September 28 and 29, 2016. Significantly, the download revealed that no pornographic material was found before those dates.

{¶ 52} Finally, evidence was adduced that Stanaford was convicted of public indecency in 1998. Based upon that 1998 conviction, a psychologist from the Ohio Department of Corrections diagnosed Stanaford as a pedophile at that time.

{¶ 53} Viewing the evidence in the light most favorable to the State, we find

sufficient evidence to support Stanaford's convictions for the two sexually violent predator specifications.

**Weight of the Evidence**

{¶ 54} Lastly, having addressed the sufficiency arguments, we now turn to the manifest weight challenge.   Having reviewed the record, we find no merit in Stanaford's argument that his conviction was against the manifest weight of the evidence.   It is well-settled that evaluating witness credibility is primarily for the trier of fact. *State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7.   Here, the jury could have reasonably credited the extensive testimony provided by the State's witnesses, applied said evidence and all reasonable inferences to the elements of the offense, and found Stanaford guilty of the kidnapping and rape of K.C.   Having reviewed the entire record, we cannot find that the evidence weighs heavily against conviction or that a manifest miscarriage of justice has occurred.

{¶ 55} Stanaford's third and fourth assignments of error are overruled.

{¶ 56} Stanaford's first assignment off error is as follows:

THE TRIAL COURT ERRED WHEN IT WOULD NOT INSTRUCT

ON LESSER INCLUDED OFFENSES.

{¶ 57} In his first assignment, Stanaford contends that the trial court erred when it refused to give the jury an instruction on lesser-included offenses of rape.   Specifically, Stanaford argues that the evidence adduced at trial required the trial court to give an instruction on gross sexual imposition (GSI) as a lesser-included offense of rape.

{¶ 58} The decision whether to give a requested jury instruction is a matter left to the sound discretion of the trial court, and its decision will not be disturbed on appeal

absent an abuse of discretion. *State v. Murrell*, 2d Dist. Montgomery No. 24717, 2012-Ohio-2108, ¶ 24, citing *State v. Davis*, 2d Dist. Montgomery No. 21904, 2007-Ohio-6680, ¶ 14. An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the court. *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980).

{¶ 59} An offense may be a lesser-included offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot be committed without the offense of the lesser degree also being committed, and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. *State v. Wilkins*, 64 Ohio St.2d 382, 415 N.E.2d 303 (1980). The mere fact that an offense can be a lesser-included offense of another offense does not mean that a court must instruct on both offenses whenever the greater offense is charged. *Id.* It is well-settled that a charge on a lesser-included offense is required only when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988); *State v. Reese*, 2d Dist. Montgomery No. 22907, 2009-Ohio-5046.

{¶ 60} As previously stated, Stanaford was found guilty of rape in violation of R.C. 2907.02(A)(1)(b), which provides:

No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

The other person is less than thirteen years of age, whether or not the

offender knows the age of the other person.

{¶ 61} Conversely, gross sexual imposition, in violation of R.C. 2907.05(A)(4), consists of the following:

No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

* * *

The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

{¶ 62} The primary difference between rape and gross sexual imposition is that the former involves "sexual conduct" whereas the latter involves only "sexual contact." *State v. Grant*, 2d Dist. Montgomery No. 19824, 2003-Ohio-7240, ¶ 19.

{¶ 63} R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 64} R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 65} We note that Stanaford's defense at trial was *not* that a rape did not occur. Rather, Stanaford's defense was that he was not the individual who assaulted K.C. Moreover, the evidence adduced at trial plainly established that Stanaford kidnapped K.C. from the bus stop, took her to the side of a nearby house, and inserted two of his fingers into her vagina. As the trial court found, the testimony of K.C., Dr. Evans, and nurse Williams established that Stanaford digitally penetrated K.C. during the assault, thereby constituting the "sexual conduct" element of rape. No evidence was adduced at trial that would support a finding of the "sexual contact" element of gross sexual imposition.

{¶ 66} After a thorough review of the record, viewing the evidence in a light most favorable to Stanaford, we find there was not sufficient evidence to allow the jury to reasonably reject the greater offense of rape and find the defendant guilty of gross sexual imposition. Therefore, the trial court did not err when it refused to instruct the jury regarding the lesser-included offense of gross sexual imposition.[1]

{¶ 67} Stanaford's first assignment of error is overruled.

{¶ 68} Stanaford's fifth and final assignment is as follows:

THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE THE KIDNAPPING AND RAPE CONVICTIONS.

{¶ 69} In his fifth assignment, Stanaford contends that the trial court erred in failing to merge his convictions for kidnapping and rape. Specifically, Stanaford argues that the restraint of the victim was incidental to the rape and that no separate conduct or animus existed.

---

[1] In his brief, Stanaford does not argue that the trial court should have instructed on a lesser included offense of kidnapping, such as abduction. Accordingly, we need not address this issue.

{¶ 70} R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 71} Initially, we note that Stanaford argues that the Ohio Supreme Court's decision in *Newark v. Vazirani,* 48 Ohio St.3d 81, 549 N.E.2d 520 (1990), contains a two-step analysis to be applied when determining whether offenses are subject to merger. The *Newark* court focused its analysis on whether the elements of the offenses overlapped based upon the defendant's conduct in that case. The *Newark* court did not compare the elements of the offenses in the abstract, but instead held that "the elements of these two crimes are so similar that the commission of one offense necessarily results in the commission of the other offense as applied to the facts of this case." *Id* at 83. *Newark*, however, is no longer the applicable standard for addressing merger issues.

{¶ 72} In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Ohio Supreme Court clarified the applicable standard with respect to the R.C. 2941.25 merger determination. In *Ruff*, the Ohio Supreme Court stated the following:

Rather than compare the elements of two offenses to determine

whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Id.* at ¶ 30-31.

{¶ 73} In *State v. Wood*, 2d Dist. Montgomery No. 26134, 2016-Ohio-143, we stated:

[T]he Ohio Supreme Court addressed the allied-offense issue again in *State v. Earley*, [145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266]. There the majority characterized the analysis in its earlier [*State v.*] *Johnson*[, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061] lead opinion as "largely obsolete." *Id.* at ¶ 11. The *Earley* court instead embraced *Ruff*, which, as noted above, considers a defendant's conduct, his animus, and the import or significance of his offenses. Applying *Ruff*,

the *Earley* court concluded that misdemeanor OVI and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Earley* at ¶ 20. For purposes of our analysis here, we note that a defendant bears the burden of establishing entitlement to merger, and we review a trial court's ruling on the issue de novo. *State v. LeGrant*, 2d Dist. Miami No. 2013-CA-44, 2014-Ohio-5803, ¶ 15.

* * *

We reach the same conclusion under the *Ruff* standard, which the Ohio Supreme Court applied in *Earley*. We see nothing in *Ruff* that alters or undermines the foregoing analysis about [the defendant's] commission of murder and aggravated robbery involving the same conduct committed with the same animus. For the reasons set forth above, we conclude that the two offenses were not committed separately and were not committed with a separate animus or motivation. These findings remain pertinent under *Ruff*, which, as noted above, provides that offenses do not merge if "(1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Ruff* at ¶ 25 [and] ¶ 30-31.

*Wood* at ¶ 54, quoting *State v. McGail*, 2015-Ohio-5384, 55 N.E.3d 513, ¶ 51, ¶ 60 (2d Dist.).

**{¶ 74}** An appellate court applies a de novo standard of review in considering a trial court's R.C. 2941.25 merger determination. *State v. Williams*, 134 Ohio St.3d 482,

2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.  "The defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

**{¶ 75}** With respect to the offenses of rape and kidnapping, the Ohio Supreme Court has acknowledged that "implicit within every forcible rape * * * is a kidnapping" because the victim's liberty is restrained during the act of forcible rape. *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979). In *Logan*, the court provided the following guidelines for determining whether kidnapping and another offense are allied offenses that should merge prior to sentencing, stating:

(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Logan* at syllabus.

**{¶ 76}** Applying these guidelines, the Ohio Supreme Court held in *Logan* that the

offender's conduct in forcing the victim into an alley before raping her at knife point was committed without a separate animus. The court found that the movement was slight, the detention brief, and the victim was released immediately after the commission of the underlying crime, compelling the court's conclusion that the kidnapping was incidental to the rape. *Id.* at 135.

{¶ 77} In support of his argument that his convictions for kidnapping and rape were subject to merger, Stanaford relies heavily on the Ohio Supreme Court's holding in *Logan.* In addition to *Logan*, Stanaford cites to *State v. Miner,* 8th Dist. Cuyahoga No. 85746, 2005-Ohio-5445. In *Miner*, the victim was held against her will in her apartment. Throughout the course of events, the defendant carried the victim from a bathroom, to a living room, and then to a bedroom. The *Miner* court found that the kidnapping/restraint was incidental to the attempted rape because the victim was never removed from the apartment and the time she was held was "not prolonged." *Id.* at ¶ 17.

{¶ 78} In *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, we addressed a case in which the defendant claimed that kidnapping was incidental to the rapes he committed. In *Portman*, the defendant led the victim through the store to a lounge-type area in the basement, which could not be seen from the parking lot and was more isolated than other parts of the store. *Id.* at ¶ 42. The defendant put a gun to her head when she expressed her desire to leave, asking her about the friend waiting in her car and preventing her from leaving. *Id.* After the rapes, the defendant again attempted to prevent her from leaving the basement, through physical restraint and brandishing the gun. *Id.* We found that although the additional aspects of time, distance, and danger that related to the kidnapping in *Portman*, as separate from the rape, were not as significant

as those found in some of the other cases we discussed, we specifically noted that the defendant threatened the victim with a gun and prevented her from leaving, before and after the rapes occurred. *Id*. Ultimately, we found that the trial court did not err in failing to merge the kidnapping count with the rape counts.

{¶ 79} In *State v. Bozeman*, 2d Dist. Clark No. 2014-CA-38, 2015-Ohio-616, we found that the kidnapping and subsequent rape of the victim were committed with a separate animus, and therefore not allied offenses of similar import. *Id.* at ¶ 18. Specifically, the victim was kidnapped at gunpoint, robbed, and then transported in her own stolen vehicle to various locations. *Id.* The victim was then raped multiple times in another undisclosed location. *Id.* After the rapes occurred, the defendant robbed the victim of her wedding rings and threatened her, again at gunpoint, not to report the incident to police or he would harm her and her family. *Id.* Accordingly, we held that due to the prolonged nature of the detention of the victim prior to the rape, the additional aspect of travel to several different locations, and the danger related to the actual kidnapping (i.e. threats made at gunpoint), the offenses were committed with a separate animus, and the trial court did not err when it failed to merge the kidnapping with the rape. *Id.*

{¶ 80} Upon review, we conclude that the facts of the instant case are distinguishable from the holdings in *Logan* and *Miner*. The evidence adduced at trial established that the kidnapping and subsequent rape of K.C. were committed with a separate animus, and therefore the offenses were not allied offenses of similar import. Specifically, Stanaford moved K.C. from the bus stop where she was waiting and took her to a secluded area on the side of house where they could not be seen from the street.

Once there, Stanaford held a knife to her throat and threatened to kill her if she tried to look at him. Because of the use of the knife, the restraint posed a substantial increase in the risk of harm separate from the rape. *See State v. Muldrew*, 2d Dist. Montgomery No. 27901, 2018-Ohio-4883, ¶ 19. Stanaford could have committed the rape and kidnapping "merely by holding the victim down," but he chose instead to use the knife. *Id.* Furthermore, once the rape had been completed, Stanaford prolonged K.C.'s detention by pushing her down on the ground and telling her to count to ten. Simply put, Stanaford intended to restrain K.C. after the rape had occurred in order to facilitate his flight and avoid being seen by K.C., so she would not be able to identify him later.

{¶ 81} Accordingly, due to the continued nature of the detention of the victim after to the rape, Stanaford's act of picking her up and moving her a different and isolated location, and the danger related to the actual kidnapping (i.e. death threats made at knifepoint), we find that the offenses were committed with a separate animus, and the trial court did not err when it failed to merge the kidnapping with the rape.

{¶ 82} Stanaford's fifth assignment of error is overruled.

{¶ 83} All of Stanaford's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Michael P. Allen

Thomas M. Kollin
Hon. Gerald Parker